**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| TIMOTHY P. REED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:10-cv-1465-TWP-MJD |
| ) | |
| MICHAEL ASTRUE, COMMISSIONER ) | |
| OF SOCIAL SECURITY ) | |
| ) | |
| Defendant. ) | |

**ENTRY ON JUDICIAL REVIEW**

This matter is before the Court for judicial review of the final decision of the Defendant, Michael Astrue, Commissioner of Social Security Administration ("the Commissioner"), denying Plaintiff Timothy P. Reed's ("Mr. Reed") application for disability insurance benefits under Title II of the Social Security Act ("the Act") and supplemental security income under Title XVI. The Commissioner denied his application initially and upon reconsideration, and Mr. Reed requested a hearing. In April 2009, an Administrative Law Judge ("ALJ") held a hearing during which Mr. Reed and a vocational expert testified. The ALJ denied Mr. Reed's application in her decision dated May 20, 2009, finding that Mr. Reed was severely impaired, but also determining that he possessed the education, experience, and residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy. The Appeals Council upheld the ALJ's decision and denied a request for review, resulting in Plaintiff's pursuit of this judicial review. For the reasons set forth below, the ALJ's decision is **REMANDED**.

## I.   APPLICABLE LAW AND STANDARD OF REVIEW

In order to qualify for disability benefits under the Act, Mr. Reed must establish that he suffers from a "disability," as defined by the Act.  The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1. is the plaintiff currently unemployed;

2. does the plaintiff have a severe impairment;

3. does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4. is the plaintiff unable to perform his past relevant work; and

5. is the plaintiff unable to perform any other work in the national economy?

C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir.2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir.1990).  A negative answer at any point, other than step 3, stops the inquiry and leads to a finding that the claimant is not disabled.  20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; the burden shifts to the Commissioner at step five.  *Briscoe*, 425 F.3d at 352.

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir.1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,*

402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir.1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's denial of benefits.  *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir.2000).

## II. BACKGROUND

Mr. Reed claims his degenerative disc disease ("DDD") and chronic obstructive pulmonary disease ("COPD") caused him to become disabled beginning February 27, 2006, at age 50.  Up until that time, Mr. Reed had been working as a shipping clerk with duties that required him to work at a "medium exertional level."  He testified that his back pain was long-standing, occasionally progressed to his left leg, and had increased with time until it reached the point where he could no longer perform his job.  Mr. Reed informed doctors that his back and hip pain started when he fell off a truck while working sometime near 1979.  After the fall he suffered from headaches as well, which subsided over time to a large degree, but then returned in spring 2006.  Over the years, chiropractic treatment, physical therapy, and a tens unit provided little to no benefit.  He has testified that walking, long periods of standing, and bending and stooping cause his pain to intensify significantly.

On February 9, 2006, Mr. Reed underwent a myocardial perfusion scan and stress test after complaining of chest pain and shortness of breath.  The results were within normal limits, but showed some bilateral apical pleural scarring and changes of centribular emphysema.  Later that month, he had a tender lower back with pain when tested for range of motion and a positive straight leg raise on his left.  An MRI in March 2006 confirmed his DDD and showed a bulging

3

disc, which displaced a nerve root. However, the EMG and needle exam performed on his left leg in April 2006 showed normal results.

Dr. Wong, a member of the Specialty Care group at IU Medical, saw Mr. Reed in May 2006, noting a mildly positive straight leg test on the left side and mild atrophy of a muscle on the top of Mr. Reed's left foot. Mr. Reed's motor function was intact and he had no muscle weakness. His reflexes were also normal and he had no sensory loss. Mr. Reed described his pain to Dr. Wong as a deep, dull ache. A bone scan ordered by Dr. Wong showed "[m]ildly increased radiopharmaceutical uptake within the proximal tibia," but "[o]therwise, no evidence of acute or chronic bone abnormality."

There was little change when Dr. Wong saw Mr. Reed again in June 2006, but the doctor noted that Mr. Reed's gait favored the left leg and that there was some slight loss of sensation in the left foot. Because he was suffering headaches again, a CT was conducted, but the results were negative. Dr. Wong suspected multiple etiologies for Mr. Reed's pain, including primarily bulging disc at L5-S1 with impingement of left S1 nerve root, degenerative disc disease, and possible underlying sacroiliac joint disease. The plan at that time was to try Lidoderm patches to provide an analgesic effect and to switch pain medication from Vicodin to Norco. Dr. Wong also recommended a consult from a neurosurgeon.

Dr. Niederwanger, at the Midwest Pain Institute, saw Plaintiff Mr. Reed in May and June of 2006. His findings with regard to muscle atrophy, strength, and reflexes were no different than Dr. Wong's, except that on at least one occasion Mr. Reed had no positive leg raise test on either side. Dr. Niederwanger also diagnosed the bulging disc and nerve displacement.

Dr. Nelson, a neurosurgeon, saw Mr. Reed in July 2006. He concluded that although Mr. Reed has degenerative disc disease with compression of the nerve root, he was not a candidate for surgical intervention at that time. Dr. Nelson found that Mr. Reed showed a positive left leg raise test, but his strength and reflexes were normal. He recommended that Mr. Reed continue conservative treatment.

Dr. Huffman, another doctor from the IU Medical Specialty Care group, examined Mr. Reed in August 2006. Dr. Huffman observed that Mr. Reed experienced a slight decrease in sensation on the top of his left foot, but his reflexes were normal and his strength was intact. Dr. Huffman opined that Mr. Reed's pain complaints were disproportionate with the objective findings. Dr. Huffman also noted that he was puzzled by Mr. Reed's lack of relief from previous treatments.

Dr. Huffman completed an attending physician's statement of disability form for submission to Mr. Reed's employer for purposes of assisting Mr. Reed in his pursuit of disability benefits from his employer's insurer. Dr. Huffman stated that Mr. Reed had a maximum ability to lift and carry 10 pounds and push and pull 20 pounds. He also remarked that Mr. Reed cannot climb, stoop, kneel, crouch or crawl, and can balance, reach, walk, sit and stand up to 2.5 hours.

Mr. Reed's family physician, Dr. Todd Ryan, also completed an attending physician's statement of disability form for Mr. Reed's employer. Dr. Ryan stated that Mr. Reed had a maximum ability to perform sedentary work in the lifting, carrying, pushing and pulling categories. Dr. Ryan commented that Mr. Reed could do no climbing, balancing, stooping, kneeling, crouching, or crawling; moreover, he could do up to 2.5 hours of standing and up to 5.5 hours of reaching, walking, and sitting.

A March 2007 examination by Dr. Huffman, after Mr. Reed exacerbated his back pain by shoveling snow, revealed that Mr. Reed claimed no relief from epidural injections which had been administered by Dr. Niederwanger. Dr. Huffman found Mr. Reed's gait "antalgic" but reported no change to his strength or reflexes. After later examinations by Dr. Huffman in February and August 2008, he reported that Mr. Reed claimed ongoing chronic back pain, which continued to flare up with the weather and caused him sleep deprivation. However, the pain was not continuing down Mr. Reed's left leg. Again, there was no change in Mr. Reed's muscle strength or reflexes.

Mr. Reed took a breathing test on October 4, 2006. Prior to medication through bronchodilation, his forced expiratory volume ("FEV1") readings were 1.43, 1.19, and 1.05, considered moderately severe obstruction. Post-bronchodilation, Mr. Reed's FEV1 readings improved to 2.47, 4.60, and 2.78.

On October 6, 2006, Mr. Reed was seen by Dr. Safadi, a state medical consulting doctor, for a social security consultative examination. He reported to Dr. Safadi that he has had back pain for roughly 30 years, and that he does have some improvement of back pain when he lies down, takes pain medication, and submerses his back in hot water. Mr. Reed claimed he is unable to walk more than one block or stand more than 10 minutes without significant pain. His posture and gait were normal and he was able to walk on heels and toes. He could squat down minimally, but with difficulty due to pain. He had some limitation in range of motion over his lumbar joint and hip joint. He also had a positive straight leg raising test. Dr. Safadi reported that there was no muscle atrophy, his motor and sensory systems were intact, and that his muscle strength and tone were normal. Dr. Safadi concluded that Mr. Reed has a history of chronic

obstructive pulmonary disease, hypertension, and chronic back pain, and that his symptoms have severely affected his quality of life.

On October 18, 2006, Dr. Richard Wenzler completed a physical residual functional capacity assessment. Dr. Wenzler concluded that Mr. Reed can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit, stand and/or walk a total of about 6 hours in an 8-hour workday, with an unlimited ability to push and/or pull. Mr. Reed was assigned occasional postural limitations, and no manipulative, visual, communicative, or environmental limitations. Dr. Mark Ruiz affirmed this determination on December 15, 2006.

### III.  THE ALJ'S DECISION

On April 14, 2009, the ALJ presided over a hearing where she heard testimony from Mr. Reed and a vocational expert, Dr. James Lanier. Subsequently, the ALJ rendered her written decision, finding that given Mr. Reed's age, education, work experience, and residual functional capacity ("RFC"), he could still perform jobs that exist in significant numbers in the national economy, meaning he is not disabled.

More specifically, the ALJ found that Mr. Reed maintained the "residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [he] can only occasionally perform postural activities of kneeling, stooping, crouching, crawling and climbing of ladders, ropes and scaffolds." She also found that he could not be exposed to frequent concentrated fumes, gases, humidity or extreme heat or cold. According to the ALJ, these restrictions did not significantly alter the occupational base of unskilled light work positions available in the national economy which Mr. Reed could perform.

## IV. ISSUES FOR REVIEW

Mr. Reed contends that the ALJ erred in three respects, each of which is addressed in turn.

### A. Did The ALJ Ignore Substantial Evidence In Support Of A Step 3 Determination That Reed's Impairment Met Or Exceeded A Listing?

At step two, the ALJ found that Mr. Reed had severe impairments in the form of his DDD and COPD. Nonetheless, at step three, the ALJ found that neither impairment met or exceeded an impairment listed in the regulations as one which dictates a finding of disability. On review, Mr. Reed claims the ALJ ignored evidence that demonstrates his impairment meets the listing for Disorders of the Spine set forth in Appendix 1 to Subpart P of Part 404 at §1.04(A), which reads:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); ...

The Commissioner contends that there was no evidence before the ALJ showing that Mr. Reed suffered any atrophy or muscle weakness, which is a required showing under the listing. The Commissioner is correct. While Mr. Reed contends that the medical records support a finding that he has "muscle wasting and weakness," only one of the three pages of medical records he cites as support mentions anything with regard to an objective finding of wasting or weakness, but that mention is in reference to a muscle at the top of his left foot. Moreover, on

that same page of the doctor's report, he reported that Mr. Reed's strength and reflexes were intact and that he had no sensory loss. Tr. 195. Mr. Reed has failed to point out any objective medical findings to support a determination that his DDD included muscle weakness or atrophy with associated muscle weakness.

The ALJ also rejected any contention that Mr. Reed's COPD met the listing for chronic pulmonary insufficiency, found at § 3.02. Mr. Reed argues that the ALJ's decision contained plain error, because she wrote that a breathing test must show an FEV1 reading of at least 1.15 for a person of Mr. Reed's height or he would be found disabled, when in actuality the regulations require a reading of at least 1.65. Mr. Reed's FEV1 reading was 1.43, and the ALJ noted that the same was in excess of the 1.15 she attributed as the minimum required FEV1 for a person Mr. Reed's height.

The Commissioner agrees that the ALJ misstated the minimum required FEV1 reading for a person Mr. Reed's height, but argues that any error by the ALJ in setting forth the minimum FEV1 reading was harmless because Mr. Reed's readings after treatment were well in excess of the 1.65 figure, which the Commissioner concedes is the accurate minimum reading required for someone of Mr. Reed's size. The medical records indicate that, after treatment with a bronchodilator, Mr. Reed's FEV1 readings were 2.47, 4.60 and 2.78. Each of these readings is above the default disability standard and there is no question that bronchodilation is a required part of the pulmonary function testing for purposes of determining disability. *See* 20 C.F.R. pt. 404, subpt. p, app. 1, § 3.00(E) (pulmonary function studies performed to assess airflow obstruction without testing after bronchodilators cannot be used to assess levels of impairment ... unless the use of bronchodilators is contraindicated).

The Court agrees with the Commissioner that any error by the ALJ in setting forth the level of a passing FEV1 reading for a person Mr. Reed's height or in her use of only Mr. Reed's pre-treatment results was harmless, insofar as his actual test scores after bronchodilation were well in excess of the default disability reading. Harmless error provides no basis for upsetting an agency determination. *Sanchez v. Barnhart,* 467 F.3d 1081, 1082-23 (7th Cir. 2006). Furthermore, in the physical RFC assessment, Dr. Wenzler and Dr. Ruiz, the state's medical consultants, agreed that Mr. Reed's pulmonary function testing confirmed that his COPD was not at the disability listing level.

Mr. Reed's final effort to assign error to the ALJ's determination on the "meet or exceeds" issue focuses on whether there was adequate medical expert testimony to sustain a determination that Mr. Reed's impairments were not medically equivalent to a listed impairment. Mr. Reed contends that no medical expert has expressed an opinion on whether his impairments equaled a listing. That is simply not the case. Both Dr. Wenzler and Dr. Ruiz completed Disability Determination and Transmittal forms dated October 24, 2006, which were based on the physical RFC assessment they completed on October 18, 2006. That assessment indicated that Mr. Reed's impairments did not meet or exceed a listed impairment. The Court agrees with the Commissioner that Mr. Reed's argument lacks merit; the transcript clearly shows that these medical records were before the ALJ and her determination states that in her review of the record she found no indication from any "medical source" that the impairments met or equaled a listing. Furthermore, at this stage the claimant bears the burden of proof.

Accordingly, the Court determines that the ALJ did not err in finding that Mr. Reed's impairment did not meet or exceed the listings found at §1.04(A) or § 3.02(A) of Appendix 1 to Subpart P of Part 404.

**B.      Did The ALJ Properly Analyze Mr. Reed's Credibility?**

Mr. Reed contends that the ALJ did not articulate her credibility analysis in a meaningful way. "The ALJ's credibility determinations are entitled to special deference but the ALJ is still required to build an accurate and logical bridge between the evidence and the result." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). Administrative law judges must "carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony about it." *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). As to the issue of credibility in this case, the ALJ concluded the following:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Transcript pgs. 36-37.

The problem facing the Court is that the ALJ makes no real effort to articulate which of Mr. Reed's statements were inconsistent with the RFC. An ALJ must provide some analysis that would allow a reviewing court to understand the weight being given to particular testimony or evidence and the basis for any doubt she might assign. *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir.2010). If the ALJ believes that the claimant is a malingerer or that he engages in exaggeration of his debilitating symptoms, there must be more than a boilerplate statement in explanation thereof. *Id.*  In more than one recent decision, the Seventh Circuit has referred to

the exact language used by this ALJ to describe her credibility analysis as "boilerplate" language with no meaning.  *See Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011); *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010).

In short, the ALJ must answer the query: "What about the claimant's testimony did you find hard to believe, and why."  The ALJ did not do that here, and while the brief in support of the Commissioner's decision has picked out items in the medical records that may conflict with particular physical complaints testified to by Mr. Reed and linked one to the other, that only amounts to speculation as to why the ALJ may have found Mr. Reed less than credible.  It is up to the ALJ to articulate why she assigned more or less weight to the evidence.  *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 488-89 (7th Cir. 2007).  That was not adequately done in this case and a remand to allow the ALJ to make a proper credibility assessment is required.

**C.     Did The ALJ Improperly Act As a Vocational Expert In Determining That Mr. Reed's Limitations Had Little Effect On The Occupational Base?**

At the hearing, the ALJ sought testimony from a vocational expert, whose qualifications were unchallenged.  The entirety of his testimony is set forth below:

Q. All right, Dr. Lanier, can you describer [sic] to us what Mr. Reed's past relevant work was?

A. Based on what I read in the file he worked as a shipping and receiving clerk, 22.3 DOT number 287-050, and that would be semi-skilled, SVP: 5, medium work.

Q. And is his description of the work consistent with the medium level of exertion?

A. Based on his testimony it would be heavy to very heavy work.

ALJ: I don't have any other questions.  Counsel, do you have any questions of Dr. Lanier?

ATTY: No questions, Judge.

In her written determination, the ALJ rightfully determined that Reed could no longer perform his previous relevant work. However, she went on to conclude that there were jobs which existed in significant number in the national economy that Mr. Reed could perform. Such jobs, the ALJ concluded, would be those that fall in the range of "light work." She based her conclusion in part on the fact that his nonexertional limitations had "little effect on the occupational base of unskilled light work."

As Mr. Reed sees it, the conclusion the ALJ reached with regard to the impact of his nonexertional limitations on the occupational base of light work was for a vocational expert to make, not for the ALJ to make on her own. He argues that the ALJ had a vocational expert available to offer expert testimony as to the impact of his limitations on the job base, but chose not to utilize that expertise, instead making a determination, as though she were the vocational expert. Mr. Reed argues that the ALJ should have, but did not, pose a hypothetical question of the vocational expert detailing his limitations.

The Commissioner argues that Social Security Ruling ("SSR") 83-14 provides the foundation for the ALJ's conclusion regarding the impact of his restrictions. Having found that Mr. Reed could perform light work based on his RFC – with only limitations on kneeling, stooping, crouching, or crawling and environmental limitations restricting his exposure to cold, heat, fumes, gases, and humidity – the ALJ could rely on SSR 83-14 as a basis to find that these additional limitations did not affect the relevant occupational base. If Mr. Reed thought additional questions to the vocational expert would have been useful or appropriate, his counsel had an opportunity to pursue such questioning at the hearing. However, no such questioning

occurred. In short, the Commissioner argues that the ALJ did not need to consult a vocational expert to make a determination on the effect of Mr. Reed's limitations on the available job base.

Mr. Reed's contention that the ALJ failed to ask the vocational expert a hypothetical question detailing his limitations begs the question of whether the ALJ was required to ask the vocational expert a question at all. He offers no citation in support of the proposition that only a vocational expert can make a determination as to whether a claimant's additional limitations have an effect on the occupational base of light work, and the Court finds none. SSR 83-14 discusses the effect of various nonexertional impairments on the occupational base, including those limitations ascribed to Mr. Reed. And, as pointed out by the Commissioner, the ruling suggests that each of the nonexertional limitations ascribed to Mr. Reed would not diminish the occupational base significantly. The ruling also discusses when the expertise of a vocational expert is required: "Where the adjudicator does not have a clear understanding of the effects of additional limitations on the job base, the services of a VS will be necessary." SSR-83-14 at *6. The Commissioner opines that the ALJ had a clear understanding and followed the guidelines in SSR 83-14.

But, notably, at this stage, the Commissioner has the burden of proof. Were this the only error assigned to the ALJ, the Court might be more inclined to side with the Commissioner and defer to the ALJ's judgment. However, as noted above, the ALJ failed to make a specific and straightforward credibility determination. Such a failure leads this Court to conclude that, without a proper assessment of credibility, she could not have had the "clear understanding" of the effect of Mr. Reed's exertional and nonexertional limitations required to avoid the need for

14

vocational expert testimony on the effects of those limitations on the light work occupational base.

> The ruling the ALJ relied on, SSR 83-14, states:
>
> The major difference between sedentary and light work is that most light jobs--particularly those at the unskilled level of complexity--require a person to be standing or walking most of the workday.  Another important difference is that the frequent lifting or carrying of objects weighing up to 10 pounds (which is required for the full range of light work) implies that the worker is able to do occasional bending of the stooping type; i.e., for no more than one-third of the workday to bend the body downward and forward by bending the spine at the waist.

SSR-83-14 at *4.  Mr. Reed testified at the hearing that his pain has gradually increased to the point where it is constant and intensified by walking, bending over, or standing for any length of time.  If this testimony is credited, the quoted language from SSR 83-14 above would suggest a significant impact on the number of light work jobs that Reed could perform.  If the ALJ attributed little or no weight to those statements, she needed to explain why.  Otherwise, there cannot be the clear understanding necessary to be assured that the effects of Mr. Reed's limitations have no significant impact on the appropriate occupational base.

## V.  CONCLUSION

Because the ALJ did not build a logical bridge between the record and her credibility determination, her determination is not supported by substantial evidence and remand is required.  *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991) (a court may remand the case after passing on its merits and issuing a judgment affirming, modifying, or reversing the Commissioner's decision, a "sentence four" remand).  If, upon remand (and after a proper credibility determination), the impact of the claimant's limitations is not clear, the ALJ should

obtain testimony from a vocational expert.    Accordingly, the ALJ's decision is **REMANDED**.


**SO ORDERED.**   03/09/2012

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana


DISTRIBUTION:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov